AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America<br><br>v.<br><br>RANJODH SING, and<br>AMANPREET GILL<br><br>*Defendants* | Case No. 20-mj-184 |

### CRIMINAL COMPLAINT

I, **Timothy C. Carroll**, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about December 3, 2020, in the Western District of New York, and elsewhere, the defendants, RANJODH SINGH and AMANPREET GILL, did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown, to distribute 100 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B); all in violation of Title 21, United States Code, Section 846.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

*Complainant's signature*

TIMOTHY C. CARROLL
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS
*Printed name and title*

Sworn to before me and signed telephonically.

Date: December 4, 2020

*Judge's signature*

HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Buffalo, New York

# AFFIDAVIT

STATE OF NEW YORK )
COUNTY OF ERIE     )  SS:
CITY OF BUFFALO    )

I, **Timothy C. Carroll**, being duly sworn, hereby depose and state as follows:

1. I am employed as a Special Agent ("SA") with the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), Buffalo, New York and have been so employed in that capacity since September 2019. Prior to employment with Homeland Security Investigations, I was employed by U.S. Customs and Border Protection (CBP) in Buffalo, New York and assigned to the Homeland Security Investigations- Border Enforcement Security Taskforce (BEST) as a Task Force Officer (TFO). Prior to employment with Customs and Border Protection, I was employed by the United States Border Patrol as a Border Patrol Agent. Duties as a Border Patrol Agent consisted of line watch operations in the Calexico, California area of responsibility in order to stop the entry of illegal persons and substances attempting to enter the United States. I am currently assigned to the HSI Buffalo Border Enforcement Security Task Force ("BEST"), an HSI sponsored law enforcement task force comprised of local, state, federal, and Canadian law enforcement officers co-located in Buffalo, New York and tasked with combatting transnational criminal organizations ("TCOs") exploiting vulnerabilities of the shared international border. As such I am a law enforcement officer of the United States, within the meaning of Section 115(c) (1) of Title 18, United States Code, who is "authorized

by law or by Government agency to engage in or supervise the prevention, detection, investigation or prosecution of any violation of Federal criminal law." Furthermore, per the Interagency Cooperation Agreement between the Drug Enforcement Administration ("DEA") and ICE/HSI, I am a cross-designated agent authorized to investigate violations of Title 21, United States Code.

2. As a Special Agent, I attended the Federal Law Enforcement Training Center ("FLETC") completing the Criminal Investigator Training Program ("CITP") and HSI Special Agent Training ("HSI SAT"). During this training, I received detailed training, both academic and practical application, in the areas of informant handling/debriefing, drug packaging, pricing, importation, and trafficking methods. In addition, I received both academic and practical application training in surveillance and counter surveillance techniques/methods. I received legal instruction in Federal drug conspiracy laws, preparing drug affidavits, the Controlled Substances Act, Fourth Amendment Searches and Seizures, Federal Rules of Evidence, and the execution of search warrants.

3. I have conducted, and assisted with complex criminal, multi-jurisdictional investigations targeting the importation, exportation, smuggling, transporting, trafficking, and distribution of controlled substances. I am familiar with how controlled substances are produced, packaged, smuggled, transported, distributed, and used within the framework of drug distribution operations conducted by TCOs and how drug traffickers and TCOs utilize wire communications to facilitate their illegal activities. I have also conducted and assisted with investigations utilizing judicially authorized intercepts of communication devices,

"wiretaps," and have reviewed recorded conversations and drug records/ledgers pertaining to narcotics trafficking. I have also conducted and participated in numerous debriefings of narcotic traffickers, confidential informants, cooperating defendants, cooperating individuals, and sources of information.

4.  The information contained in this affidavit is based upon your affiant's personal knowledge, upon reports and information received from other law enforcement officers and agencies, and other law enforcement activities.

5.  The statements contained in this affidavit are based on my involvement in this investigation, as well as information provided to me by other law enforcement officers in this investigation. Because this affidavit is being submitted for the limited purpose of seeking a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause to believe that **Ranjodh SINGH** and **Amanpreet GILL** knowingly violated Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(B).

## PROBABLE CAUSE

6.  On December 1, 2020, Customs and Border Protection Officers (CBP) assigned to the Buffalo, NY Peace Bridge Cargo Facility encountered a J-Y Transport Limited employee (hereinafter, the driver) and sole-occupant of a Canadian plated tractor-trailer bearing registered license plate ON/CA 3503PX. The driver advised CBP officers that he was traveling to 132 Belmont Drive, Somerset, New Jersey to deliver a shipment of "aluminum

clad insulated panels" that he picked up in Toronto, Ontario. The driver's paperwork indicated that the panels were destined for "Smartway Associates". The shipment was targeted based on it being from 55 Browns Line, Toronto, Ontario, as this shipping address was related to a previous Port of Buffalo narcotics seizure on June 12, 2020 resulting in approximately 423 lbs. of marijuana being seized.

7. The truck was referred to secondary inspection for a vehicle x-ray scan. The Vehicle and Cargo Inspection System (VACIS) scan of the tractor trailer revealed an anomaly within the shipment. Subsequently, the conveyance was escorted to the dock for a physical examination.

8. During the physical exam, CBP Officers removed the top aluminum panel which revealed suspected marijuana concealed inside the remaining hollowed out aluminum panels. The suspected marijuana was packaged in an undetermined amount of vacuum sealed packages. One package was removed from the shipment in order to be field tested. This small sample of the suspected marijuana was field tested using the Duquenois-Levine Reagent #908 test kit. The sample tested positive for THC, which indicates the substance to be marijuana. Additionally, a suspected GPS tracker was found within the shipment which indicates to your Affiant that the criminal organization had the ability to track the location of the shipment and the desire to know the shipments whereabouts in real time. Drug trafficking networks will often place GPS trackers within contraband loads in order to know its whereabouts and whether of not it was detained at the United States border.

9. Due to the discovery of the panels containing suspected marijuana and a positive field test, HSI requested that the driver continue to his intended destination under the supervisions of HSI agents. HSI Buffalo personnel followed the tractor and trailer to its manifested destination of New Jersey, maintaining constant surveillance of the cargo. The driver was required to stop driving due to running out of "hours", and subsequently spent the night at the Pembroke rest area off the NY State Thruway.

10. On December 2, 2020, the driver and HSI personnel continued driving to New Jersey. The driver received a call from an individual named "Alex" from "Sure Lock Panels". "Alex" later called again and stated that the delivery destination was going to be changed. Shortly thereafter the driver received a text message that read: "21 distribution Way Monmouth junction ask for Jim. Tel 732 297 4400." At approximately 1343 hours, the driver received a text message that read: "Hermann warehouse".

11. At approximately 1300 hours, HSI Newark SAs initiated surveillance at the Smartway Associates Warehouse, 142 Belmont Drive, Somerset, New Jersey. This location was suspected of being the same location as the "132 Belmont Drive" location found in the driver's paperwork. During that surveillance, law enforcement observed a black Ford Mustang, bearing New York license plate GILLNY, parked in the parking lot of the warehouse. At approximately 1348 hours, HSI Newark received information that the location of the shipment was moved to Hermann Warehouse, 21 Distribution Way, Monmouth Junction, New Jersey. Surveillance at Smartway Associates Warehouse was concluded at this time.

12. At approximately 1449 hours, law enforcement observed a silver Honda Accord, bearing New York license plate KGR6234, pull into the parking lot of Hermann Warehouse and park. Law enforcement observed the Honda Accord leave the parking lot. After a brief period, law enforcement observed the Honda Accord return to the parking lot.

13. At approximately 1603 hours, the driver arrived at the "Hermann Warehouse" and backed into a dock space to be unloaded. Law enforcement observed an individual from the Honda Accord appearing to take pictures of the driver's truck/cargo when he arrived at the warehouse location. At approximately 1635 hours, law enforcement observed the Ford Mustang, previously observed at the Smartway Associates Warehouse, arrive at the Hermann Warehouse and park close to the location where the driver was parked. The Ford Mustang stayed for a short period of time before relocating close to where the Honda Accord was parked. At approximately 1645 hours, the Ford Mustang was observed exiting the area.

14. At approximately 1712 hours, the driver's flat bed trailer was finished with the unloading process of the aluminum clad insulated panels and the unknown quantity of vacuum sealed packages of marijuana. The driver then departed the scene in his commercial tractor trailer. The Honda Accord proceeded to follow the driver out of the area.

15. On December 3, 2020, at approximately 1030 hours, the Hermann Warehouse was informed by an individual unknown to SAs that a truck was booked to pick up the aluminum clad insulated panel load dropped off by the driver, no estimated time of arrival

was provided.

16. Later that same day, law enforcement observed the silver Honda Accord, pull back into the Hermann Warehouse complex. Law enforcement observed the black Ford Mustang arrive at the Hermann Warehouse and provided an already parked tractor-trailer style commercial truck with moving dollies. The commercial truck then backed into a loading bay. Law enforcement then observed the new commercial truck being loaded with the aluminum insulated panels that were dropped off by the driver. The commercial trucking company was identified as Road King Transportation LLC by law enforcement. The Road King Transportation LLC truck departed the Hermann Warehouse complex and then was observed backing into a loading bay at 142 Belmont Drive, Somerset, New Jersey 08873. At this time, the black Ford Mustang was already on scene at the 142 Belmont Drive warehouse.

17. At approximately 1635 hours, law enforcement approached the warehouse and discovered two occupants of the warehouse. All occupants were taken into custody and a security sweep of the warehouse was performed for officer safety. A search of the warehouse was conducted after written consent was given to law enforcement by the warehouse lessee. Law enforcement identified the occupants of the warehouse as **Amanpreet GILL** (warehouse lessee) and **A.J** (the truck driver of Road King Transportation LLC). Law enforcement also located within the warehouse three empty wood crates used to ship refrigerators from Canada to the United States. Additionally, another aluminum clad insulated panel shipment was discovered in the warehouse next to the panels that had been offloaded on that day. No drugs were found in the already present panel, however the panel was hollowed out and filled with

shipping peanuts.

18.     Law enforcement began an interview with **GILL**. Before speaking with **GILL**, he was issued his Miranda warnings. **GILL** waived his Miranda rights by a waiver form and agreed to speak with law enforcement regarding the day's events.

19.     **GILL** stated he received an insulated panel load from "Sure Lock" a month ago to the warehouse where he was encountered on this date. **GILL** stated that yesterday he again received a shipment of insulated panels from "Sure Lock". **GILL** stated that he just opened a business and it is not established yet and that the business will eventually be a cross dock warehouse company. **GILL** stated that this was the third shipment he received at that warehouse since opening. Two of the previous shipments were the same insulated panel product and the third shipment was used in a traditional cross dock fashion by a different individual. **GILL** stated that regarding the insulated panels he had within the warehouse he was planning to sell them online to whomever would buy them. The panels cost approximately $9,000 in United States currency. **GILL** claimed that both shipments of insulated panels were ordered from "Sure Lock" out of Canada.

20.     **GILL** stated that he met the individual associated with "Sure Lock", named Jai, in India, at the gym. **GILL** has known Jai for six or seven years however he has not seen Jai in five or six years. **GILL** called Jai once arriving to the United States and was told that Jai would help him out after he stated his warehouse business. **GILL** stated that Jai told him that his company "Sure Lock" would give him 120 days credit to sell product in the United States before paying them. **GILL** stated that even though he was starting a company and had

8

already received product, with a 120 day window to make a payment, that he hadn't made a business website yet. **GILL** received the first insulated panel shipment approximately a month and a half ago. **GILL** informed SAs that he was waiting to receive more product before he began to sell anything. **GILL** has held the lease on the warehouse for approximately three months, using all his savings to start up his business/lease the warehouse. Prior to this, **GILL** worked as a truck driver.

21. **GILL** told law enforcement that he had ordered another load of panels a week ago but had received no paperwork associated with the order. Jai told him last minute that the shipment he had ordered was already in New Jersey and ready for pick up. At this point, **GILL** called A.J, who is a truck driver, and asked him if he could help him pick up a load and transport it to his warehouse. A.J subsequently agreed to help **GILL**. Law enforcement informed **GILL** that marijuana was found in his shipment. **GILL** consented for law enforcement to search the other insulation panels found in his warehouse and requested to be shown the marijuana. **GILL** subsequently signed a consent form to search his warehouse as well as his cellular telephones. **GILL** also provided the passwords for his cellular phones.

22. **GILL** was asked by law enforcement about the tracker that was in the insulated panel load and where it currently was. **GILL** stated that Jai told him there was a tracker in it. **GILL** stated that it was standard to have a tracker in the shipment for some companies. **GILL** did not have access to track the load, but Jai did. **GILL** was asked by law enforcement if the previous panel load he had received last month also had a tracker in it to which **GILL** replied

9

no. Law enforcement escorted **GILL** back into the warehouse area where he was shown the marijuana. After returning from viewing the marijuana, and briefly speaking with law enforcement again, the interview concluded per **GILL's** request.

23.     A.J was also interviewed by law enforcement on scene. Before speaking with A.J, he was issued his Miranda warnings. A.J waived his Miranda rights by a waiver form and agreed to speak with law enforcement regarding the day's events.

24.     A.J informed SA Jeffers that he had received a text message from **GILL** on December 3, 2020 asking for assistance transporting a load. The truck he was driving on December 3, 2020 belonged to his company, Road King Transportation, and was only borrowed to help move **GILL's** product. A.J claimed he was not paid by **GILL** for his assistance. A.J denied knowledge of marijuana being present in the load or **GILL** being involved in any type of narcotics activity. A.J stated that he transported the panels over to the warehouse at 142 Belmont Drive, leased by **GILL**. At that location, **GILL** unloaded the panels and placed them within the warehouse. A.J then stated that **GILL** removed the GPS tracker and gave it to A.J, telling him to throw it in the garbage. A.J stated he placed the GPS tracker in his pocket and then used the bathroom. A.J stated that he was planning on leaving when encountered by law enforcement. The GPS tracker was found on his person by law enforcement

25.     HSI SA's and task force officers conducted an extended border search of the insulated panel load. The load was eventually determined to contain approximately 452.42

kilograms of marijuana.

26. At approximately 1910 hours, the Silver Honda Accord observed earlier in the day arrived at the warehouse. The driver was detained for questioning and was identified as **Ranjodh SINGH**.

27. Law enforcement began an interview with **SINGH**. Before speaking with **SINGH**, he was issued his <u>Miranda</u> rights. **SINGH** waived his <u>Miranda</u> rights and agreed to speak with law enforcement regarding the day's events by signing a waiver form.

28. **SINGH** told law enforcement that he was going to the warehouse to meet a friend from California. **SINGH** stated that the friend he was meeting he met via online gaming. **SINGH** stated that his friend was a truck driver that was traveling from California to New Jersey. **SINGH** has never met or seen this individual before. When asked what **SINGH** had done earlier in the day, he replied that he had been at home. **SINGH** stated that the car he was driving was his friend's car. Law enforcement asked **SINGH** if he had been at a different warehouse earlier in that day to which he replied he was not and "I think that's all I can say about that". Law enforcement again asked **SINGH** if he was at a different warehouse taking pictures of a truck yesterday. **SINGH** stated that he was not and "that's enough for me, I cannot say anything. That's all for me". Law enforcement then informed **SINGH** that they were aware that he was at the warehouse because they had observed him taking pictures of the truck. **SINGH** again refused to talk about that. **SINGH** then stated he did not wish to continue at which time law enforcement ended the interview.

11

29. Law enforcement seized an iPhone 7 plus (hereinafter "**GILL** Phone") from **GILL**. **GILL** provided consent to search the device and signed a consent to search form for the device. An initial review of the device conducted by law enforcement revealed texts from a Canadian number providing warehouse information and updates regarding the shipments. Several missed calls from a Canadian number were also discovered on the device.

30. Law enforcement also seized an iPhone 11 Pro Max (hereinafter "**RANJODH** Phone") from **Ranjodh SINGH**. **SINGH** provided consent to search the device and signed a consent to search form for the device. Inspection of **SINGH**'s phone revealed videos showing him identifying law enforcement personnel while he was driving around the warehouses. Law enforcement also viewed approximately 16 photos that appear to be the blue truck driven by the driver when he was parked and unloading at Hermann warehouse. Based on my training and experience, this behavior is consistent with that of drug traffickers.

31. Based on your affiant's training and experience, and knowledge throughout the course of this investigation it is the motus operandi for individuals receiving bulk quantities of marijuana from Canada to be controlled/directed by individuals who remain in Canada. An initial review of both **GILL's** and **RANJODH's** phone show them being in constant communication with two separate Canadian numbers throughout the delivery process. Although both individuals were communicating with two different Canadian numbers, both **GILL** and **RANJODH** received the same warehouse information and similar updates. **RANJODH** also received the address of the warehouse space rented by **GILL**, where the marijuana was ultimately unloaded, suggesting that both individuals were part of the same overall conspiracy to smuggle the bulk marijuana. Also contained on **RANJODH's** cell

phone was a photo of a Ria money transfer receipt for $1,500 in Canadian currency. Prior information relating to this investigation has revealed that the organizing individuals in Canada will send payment to the parties in the United States to support the drug trafficking activities via money order.

32.     Based on the initial review of the phone belonging to **GILL** it is also this affiants experience that companies in Canada participating in legitimate business do not constantly call and message the purchaser of their product and remain actively engaged with them until it is delivered. The constant updates and amount of missed calls is indicative of drug trafficking status updates.

33.     Based upon the previous seized marijuana shipment at the border by CBP on June 12, 2020, originating from the same warehouse in Canada, the fact that the vehicles driven by both individuals were seen at the same warehouse where the insulated panel load containing marijuana was stored the night before, along with both individuals arriving at the marijuana loads final destination warehouse and, review of both individuals phones showing both individuals communicated constantly with Canada throughout the importation process and receiving corresponding information to one another, it is reasonably foreseeable that the both defendants are within the scope of the conspiracy.

## CONCLUSION

34.     Based upon the foregoing, I respectfully submit that I have probable cause to believe that **Ranjodh SINGH** and **Amanpreet GILL** have violated Title 21, United States

Code, Section 846, in that the two conspired to possess with intent to distribute 100 kilograms or more of a mixture and substance containing marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

_____
TIMOTHY C. CARROLL
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me telephonically

this _4_ day of December, 2020.

_____
HONORABLE H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

14